**HARVARD DRUG GROUP, LLC, Plaintiff(s),**

v.

**Stephen D. LINEHAN, Defendant(s).**

**Case No.: 08–13617.**

United States District Court, E.D. Michigan, Southern Division.

Feb. 3, 2010.

Jeffrey M. Stefan, Stephen E. Glazek, Barris, Sott, Detroit, MI, for Plaintiff.

Donna A. Heiser, Kotz, Sangster, et al, Detroit, MI, for Defendant.

## ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

VICTORIA A. ROBERTS, District Judge.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Harvard Drug Group, LLC is a wholesale distributor of medication. Soporex, Inc. purchased medications from Harvard. Defendant Stephen Linehan is the Chairman and CEO of Soporex.

In a letter dated May 22, 2008, Linehan acknowledged that Soporex owed Harvard $1,918,152.94 for unpaid orders.

On June 6, 2008, Harvard and Soporex entered into an Exclusive Purchase Agreement. Soporex agreed to purchase nebulizer medications exclusively from Harvard until December 21, 2008. On that same date, Linehan signed a Guaranty, which says he personally guarantees payment to Harvard, up to $2 million, for purchases Soporex makes pursuant to "New Invoices." "New Invoices" is defined as Soporex's additional purchases of pharmaceutical goods from Harvard beginning June 6, 2008.

On July 24, 2008, Harvard and Soporex signed a First Amendment to the Exclusive Purchase Agreement Dated June 6, 2008 ("First Amendment"). Soporex agreed to pay interest in the amount of 7.5% per annum on the "Open Account Balance." "Open Account Balance" is defined as the amount Soporex owes Harvard for purchases beginning May 22, 2008. Richard J. Sabolik, Soporex's President, signed the First Amendment. Linehan's Guaranty was not amended.

Harvard has been unable to collect on the entire of Soporex's unpaid balance—balances both before and since May 22, 2008.

Before the Court is Harvard's Motion for Summary Judgment. (Doc. # 9). Harvard asks the Court to find Linehan liable under the June 6, 2008 Guaranty for the "New Invoices"; and, find Linehan must pay 7.5% interest pursuant to the First Amendment.

Magistrate Judge Michael Hluchaniuk recommends the Court GRANT Harvard's motion. (Doc. # 46). The Magistrate Judge says: (1) Linehan's duress, fraudulent inducement, and equitable estoppel defenses fail; and (2) Linehan must pay interest on the debt owed by Soporex.

Linehan objects. He says the Magistrate Judge's Report and Recommendation ("R & R"): (1) fails to consider all evidence and inferences in the light most

favorable to him; (2) inappropriately weighs the evidence, makes credibility determinations, and draws inferences; (3) does not consider material factual issues pertaining to the First Amendment, when it materially changed his obligations under his Guaranty; and (4) implies that he did not contest the propriety of Harvard's request for attorney fees.

The Court **ADOPTS** the Magistrate Judge's R & R.

## II. STANDARD OF REVIEW

The district court must conduct a de novo review of the parts of a magistrate judge's order to which a party objects. 28 U.S.C. § 636(b)(1). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* The requirement of de novo review "is a statutory recognition that Article III of the United States Constitution mandates that the judicial power of the United States be vested in judges with life tenure." *United States v. Shami,* 754 F.2d 670, 672 (6th Cir.1985). Accordingly, Congress enacted 28 U.S.C. § 636(b)(1) to "insure[ ] that the district judge would be the final arbiter" of a matter referred to a magistrate judge. *Flournoy v. Marshall,* 842 F.2d 875, 878 (6th Cir.1988).

## III. APPLICABLE LAW AND ANALYSIS

**A. Linehan's Objections that When the Magistrate Judge Analyzed His Equitable Estoppel Defense, He: (1) Failed to Consider all Evidence and Inferences in a Light Most Favorable to Linehan; and (2) Inappropriately Weighed the Evidence, Made Credibility Determinations, and Drew Inferences in Favor of Harvard**

Linehan says Harvard is equitably estopped from pursuing a claim against him for an amount that exceeds $1 million. According to Linehan, Harvard initially said he only had to sign a $1 million personal guaranty, and Mickey Letson, a Harvard employee and Soporex board member, would sign a $1 million personal guaranty.

The Magistrate Judge's R & R says:

The factual basis for [Linehan's] argument is the claim that CEO [Randolph] Friedman "knew from the beginning Letson would not be allowed to execute a guaranty." (Dkt. 40, p. 17). [Linehan] does not cite to any portion of the record for this assertion. Friedman's deposition testimony does not support this claim. Friedman stated he let "everyone" know the board would not accept a guaranty from Letson but only said that ... before the relevant documents were signed without specifying how long before. (Dkt. 41, Ex. 12, pp. 48–49). It is not clear what [Linehan] meant by "from the beginning" but one could reasonably assume it meant from the beginning of these negotiations which [Linehan's] counsel stated was around May 24, 2008. (Dkt. 40, Ex. D, ¶¶ 10–11). There is nothing in the record to support the claim that [Harvard's] agents misled [Linehan] from the outset of the negotiations regarding Letson's willingness and authorization to execute a guaranty.

Magistrate Judge's R & R, p. 935, n. 5.

In addition, the Magistrate Judge says:

[Harvard's] CEO Randolph Friedman testified during a deposition that a guaranty from Letson would not be acceptable to the board and, therefore, if Soporex wanted a two million dollar line of credit, the guaranty would have to be in

that amount. (Dkt. 41, Ex. 12, pp. 48–49). This suggests that [Linehan], after learning that the Letson guaranty was not available, elected to increase the amount of his personal guaranty in order to increase the line of credit to the higher amount.

Magistrate Judge's R & R, p. 935, n. 4.

Linehan says the Magistrate Judge ignored his evidence that shows: (1) Friedman knew from the beginning of the negotiations that Letson could not sign a $1 million personal guaranty, but Harvard did not inform Linehan of this fact and the fact that Linehan's personal guaranty would be $2 million until shortly before he signed the Guaranty; (2) Harvard referenced two guaranties throughout the negotiations; (3) Harvard falsely stated on multiple occasions that Letson was provided a proposed personal guaranty for his signature; and (4) the Exclusive Purchase Agreement referenced two guaranties until Harvard created the final draft.

Further, Linehan says he did not "elect" to sign the $2 million Guaranty; he signed the Guaranty based on Soporex's critically low inventory of nebulizer medications, the fact that Soporex's customers relied on those medications for their life threatening conditions, Soporex's inability to obtain an alternative source for the medications, and Harvard's last minute notification that Letson could not sign a personal guaranty. According to Linehan, the Magistrate Judge's statement that he "elected" to sign the Guaranty—based on testimony from Harvard's CEO—inappropriately draws inferences in Harvard's favor.

■ "An equitable estoppel arises where (1) a party by representation, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on this belief, and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts." *Hughes v. Almena Twp.*, 284 Mich. App. 50, 78, 771 N.W.2d 453 (2009) (citing *Howard Twp. Bd. of Trustees v. Waldo*, 168 Mich.App. 565, 575, 425 N.W.2d 180 (1988)). "[A] party who is actually 'cognizant of all the material facts can claim nothing by estoppel[.]'" *Sisk–Rathburn v. Farm Bureau Gen. Ins. Co. of Michigan*, 279 Mich.App. 425, 429, 760 N.W.2d 878 (2008) (citing *Cudahy Bros. Co. v. W. Michigan Dock & Mkt. Corp.*, 285 Mich. 18, 26–27, 280 N.W. 93 (1938)); *see also Thirlby v. Rainbow*, 93 Mich. 164, 170, 53 N.W. 159 (1892) ("There can be no estoppel unless a party is misled to his prejudice by the conduct of the person against whom it is set up, and acts are done relying upon conduct calculated to mislead") (citations omitted).

■ Regardless of why Linehan signed the Guaranty, and what Harvard may have told Linehan during negotiations, it is undisputed that Linehan knew—before he signed the Guaranty—that Letson could not sign a personal guaranty, and his personal guaranty would be $2 million.

Even if the Magistrate Judge considered all of Linehan's evidence, and the reasons why Linehan says he signed the Guaranty, his equitable estoppel defense fails as a matter of law; Linehan was cognizant of all the material facts before he signed the Guaranty.

**B. Linehan's Objection that the Magistrate Judge Failed to Consider all Evidence and Inferences in a Light Most Favorable to Him When the Magistrate Judge Analyzed His Duress Defense**

The Magistrate Judge's R & R says:

The health related needs of [Linehan's] customers are of little relevance to th[e] [duress] analysis. It is reasonably assumed that in the American marketplace [Linehan's] customers could have gone

to any number of alternate sources for their medications. This assumption is borne out by the deposition testimony of Mickey Letson when he described his successful attempts to find other medication sources for the Soporex "patients." (Dkt. 40, Ex. T, p. 153).

Magistrate Judge's R & R, p. 931, n. 3.

Linehan says the Magistrate Judge's statement that his customers could have obtained medication from other sources—based on testimony from a Harvard employee—inappropriately draws an inference in Harvard's favor, and ignores his evidence that Soporex could not obtain alternative sources for the medication needs of its patients.

Further, Linehan says the Magistrate Judge ignored his argument that he was under duress when he signed the Guaranty, because Medicare and Soporex's pharmacy licenses prohibit him from stopping medication shipments to Soporex's customers.

■ "Duress requires compulsion or coercion by which one is illegally forced to act by fear of serious injury to person, reputation or fortune. Fear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully." *Apfelblat v. Nat'l Bank Wyandotte–Taylor*, 158 Mich.App. 258, 263–64, 404 N.W.2d 725 (1987) (citations omitted).

■ Regardless of whether Soporex's customers could obtain medication elsewhere, and regardless of the requirements of Medicare and Soporex's pharmacy licenses, Linehan's duress defense fails. Harvard did not act unlawfully by requiring Linehan to sign a $2 million Guaranty as a condition to continued shipments to Soporex.

## C. Linehan's Objection that the Magistrate Judge Failed to Consider Material Factual Issues Pertaining to the First Amendment, when it Made a Material Change to the Obligations Under His Guaranty

According to Linehan: (1) he did not guarantee the "Open Account Balance" (incorrectly referred to in Linehan's objections as "Outstanding Invoices"); (2) the Guaranty does not address interest payments, nor did he consent to pay interest; (3) Harvard repeatedly sought his consent to the First Amendment; (4) Harvard's general counsel admitted that amendments to his Guaranty had to be in writing; (5) increasing the amount payable on the original obligation constitutes a material alteration of his Guaranty that he must consent to; and (6) modification of his Guaranty must be supported by consideration.

The Court agrees with the Magistrate Judge's recommendation that Linehan is obligated to pay interest on the New Invoices.

First, "New Invoices" (used in Linehan's Guaranty) and "Open Account Balance" (used in the First Amendment), refer to Soporex's additional purchases from June 6, 2008, of pharmaceutical goods from Harvard. While "Open Account Balance" refers to purchases made beginning May 22, 2008, Soporex did not make any purchases from Harvard between May 22, 2008 and June 6, 2008. Therefore, "New Invoices" and "Open Account Balance" essentially have the same meaning.

Second, while Linehan's Guaranty does not expressly provide that he is responsible for interest payments, it does say he consents to modifications and amendments to the New Invoices agreed to by Soporex, and waives notice of such modifications and amendments.

■ Michigan law generally provides that "[a]ny material alteration of a principal debt or obligation operates to completely discharge any guaranty of that debt or obligation[.]" *Wilson Leasing Co. v. Seaway Pharmacal Corp.*, 53 Mich.App. 359, 369, 220 N.W.2d 83 (1974) (citations omitted). An alteration of a principal debt that increases that debt is material. *Id.* An exception to this general rule is where the alteration of the principal debt is "anticipated as a possibility" by the guaranty agreement. *See Estate of Bluestone v. Gen. Elec. Credit Corp.*, 121 Mich.App. 659, 667, 329 N.W.2d 446 (1982). Linehan's Guaranty says:

> . . .
>
> Guarantor does . . . unconditionally and absolutely . . . guarantee to [Harvard] . . . the full and prompt payment . . . of all principal, service charges and other sums payable under the New Invoices.
>
> . . .
>
> ■ Guarantor hereby consents to any modifications and amendments to the New Invoices agreed to by Soporex and agrees that this Guaranty shall relate to the obligations of Soporex under such New Invoices as they may exist before and after all such modifications or amendments and hereby waives any notice of such modifications of amendments.

"The fact that [Linehan] expressly waived notice to future modifications demonstrates that [he] 'anticipated' the possibility of such modifications. Hence, any . . . agreements which modified [Soporex's] obligations did not operate to discharge [Linehan], even if the modifications were material." *See id.* at 667–68, 329 N.W.2d 446.

Third, Harvard's general counsel testified at his deposition that a signature line was included on the first draft of the First Amendment because he felt it would be appropriate to have him sign the First Amendment; it was not absolutely necessary. Further, in an e-mail dated July 23, 2008, Soporex's general counsel said "I will take a look at this today and finalize. I don't believe [Linehan] is in a position to sign anything given his condition. Please consider whether we really need [Linehan] to sign. I think the guaranty gives Harvard ample protection and that [Linehan's] signature on the first amendment is really a confirmation of his obligations under the guaranty."

Finally, Linehan's Guaranty was not amended or modified; only the Exclusive Purchase Agreement was amended, and the amendment was in writing.

**D. Linehan's Objection that the Magistrate Judge Implies that He Did not Contest the Propriety of Harvard's Request for Attorney Fees**

The Magistrate Judge's R & R says:

> In his response to [Harvard's] motion, [Linehan] did not question [Harvard's] entitlement to reasonable attorney fees if [Harvard] prevails on this motion but [Linehan] did challenge the amount of attorney fees [Harvard] should receive. At the hearing on the present motion, the parties stipulated that damage issues should not be addressed by the court at this time in that [Harvard] intended on amending its complaint to present additional claims for damages and that damages should be reserved until a decision was made on [Linehan's] liability for [Harvard's] claims.

Magistrate Judge's R & R, p. 930, n. 1.

As both Linehan and the Magistrate Judge point out, damages are not before the Court now; Harvard withdrew its motion as to damages.

## IV. CONCLUSION

The Court **ADOPTS** the Magistrate Judge's R & R. Harvard's motion for summary judgment on Linehan's liability is **GRANTED**. Linehan is liable for New Invoices under his Guaranty and the First Amendment; he guaranteed payment of principal and interest on the New Invoices, up to $2 million.

By **February 17, 2010,** Harvard may file a combined motion for leave to amend its complaint to increase the amount Linehan owes under the Guaranty, and motion for attorneys fees. Harvard may include its renewed affidavits regarding its attorney fees. In his response brief, Linehan may assert his arguments that Harvard is either not entitled to attorney fees, or Harvard's attorney fees are unreasonable.

**IT IS ORDERED.**

### REPORT AND RECOMMENDATION PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 9)

MICHAEL HLUCHANIUK, United States Magistrate Judge.

## I. PROCEDURAL HISTORY

The original complaint in this matter was filed on August 20, 2008. (Dkt. 1). An answer to the complaint, with affirmative defenses, was filed on October 15, 2008. (Dkt. 5). The present motion for summary judgment was filed by plaintiff on December 23, 2008. (Dkt. 9). Defendant filed a response to the motion on January 14, 2009 and plaintiff replied to the response on January 20, 2009. (Dkt. 11, 13).

A first amended complaint was filed on February 10, 2009. (Dkt. 24). After the resolution of some scheduling issues, the parties were directed to file supplemental pleadings with respect to the motion for summary judgment. (Dkt. 39). Defendant filed a supplemental brief on August 19, 2009 and plaintiff supplemented its brief on September 2, 2009. (Dkt. 40, 41).

The parties filed a statement of resolved and unresolved issues on September 8, 2009. (Dkt. 42). Oral argument was held on September 22, 2009.

## II. RELEVANT FACTS

The relevant facts in this matter are largely uncontested. During the relevant time periods plaintiff, Harvard Drug Group, LLC (Harvard) was a wholesale distributor of certain medications and related products and defendant, Stephen D. Linehan (Linehan or defendant) was the chairman and CEO of Soporex Respiratory, Inc. d/b/a Independent Home Pharmacy (Soporex), which was a retail distributor of such products. On May 22, 2008, Soporex was in debt to Harvard for almost two million dollars for purchases that had been made on a credit basis and, in an apparent attempt to continue to do business with Harvard, entered into an agreement with Harvard that called for Soporex to pay $75,000 per week on the existing debt and to pay the existing debt in full by July 28, 2008. (Dkt. 24, Ex. 1). The agreement did not include any provision regarding future credit sales.

Following the May 22, 2008, agreement, Harvard and Soporex engaged in discussions relating to future credit sales. On June 6, 2008, Harvard and Soporex entered into an Exclusive Purchase Agreement calling for Soporex to exclusively purchase, with some exceptions, various items from Harvard from that date through December 31, 2008, and to pay for those new purchases within 30 days of the invoice date. (Dkt. 24, Ex. 2). Additionally, Linehan, on the same date the Exclusive Purchase Agreement was executed, signed a Guaranty, which provided that Linehan would personally guaranty payment to Harvard, up to $2,000,000, for the products purchased by Soporex pursuant

to the Exclusive Purchase Agreement. (Dkt. 24, Ex. 3).

Soporex defaulted on the payment terms of the June 6, 2008, Exclusive Purchase Agreement and, on July 24, 2008, Harvard and Soporex entered into a First Amendment to the Exclusive Purchase Agreement which, generally, acknowledged that the existing debt associated with the Exclusive Purchase Agreement was approximately $1.4 million and that interest of 7.5% would be paid on the debt from July 22, 2008. Linehan did not sign the amendment to the Exclusive Purchase Agreement on behalf of Soporex because he had been involved in a tragic car accident on July 18, 2008, which left him severely injured and took the life of his wife and another passenger. The June 6, 2008, Guaranty executed by Linehan was not amended. Linehan did not have significant involvement in the operation of Soporex after the accident.

Things did not go well after for Soporex after July 24, 2008 and on August 19, 2008, Harvard made a demand to Soporex for the approximately $2 million debt relating to purchases prior to May 22, 2008, and for the approximately $1.4 million debt, plus interest, relating to purchases under the Exclusive Purchase Agreement made after June 6, 2008. Harvard made a similar demand, at the same time, to Linehan limited to the approximately $1.4 million debt plus interest.

### III. STANDARD OF REVIEW

Harvard is seeking a summary judgment in his favor. Summary judgment is appropriate under Rule 56(b) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In *Copeland v. Machulis,* 57 F.3d 476, 478–79 (6th Cir.1995), the court stated the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

A genuine issue of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for the non-moving party. *Ciminillo v. Streicher,* 434 F.3d 461, 464 (6th Cir.2006).

"In deciding a motion for summary judgment, [the] court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir.2000). This is not to say that some credibility determinations are beyond what is appropriate in deciding a motion for summary judgment. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

Jurisdiction in this matter is based on diversity and therefore the law of the forum state, in this case Michigan, applies. *Himmel v. Ford Motor Co.,* 342 F.3d 593,

598 (6th Cir.2003). Additionally, the parties agree, based on the pleadings, that Michigan law applies to the substantive issues relevant to this case.

## IV. ANALYSIS AND CONCLUSIONS

Plaintiff's position can fairly be summarized as arguing that defendant signed a personal guaranty for the debt of Soporex relating to product supplied by Harvard to Soporex after June 6, 2008 and the amount of the debt is approximately $1.4 million. Additionally, plaintiff contends that defendant is responsible for interest on that amount starting on July 28, 2008, and that plaintiff is entitled to recover its attorney fees under the terms of the guaranty.

Defendant's position can fairly be summarized as arguing that (1) the personal guaranty is void because defendant was under duress at the time he signed the guaranty, (2) the personal guaranty is void because defendant was fraudulently induced into signing it, (3) plaintiff should be equitably estopped from recovering more than $1 million because plaintiff had led defendant to believe that another person would make a personal guaranty for $1 million until just before defendant was asked to sign the personal guaranty for $2 million, and (4) plaintiff is not entitled to recover interest under the terms of the First Amendment to the Exclusive Purchase Agreement against defendant because he never personally agreed to pay interest.[1]

### A. Duress

Defendant contends that he was under duress at the time he signed the personal guaranty of the Soporex debt. The factual basis for that claim is that defendant knew that some of Soporex's "patients" suffered from chronic conditions and relied on medications supplied by Soporex for their treatment without which the patients' condition "could worsen" or they could potentially die. Additionally, defendant contends that plaintiff knew that Soporex was running low on these medications at the time the guaranty was signed and the medications were critical to the health of some of Soporex's patients. In order to supply these individuals with their needed medications, defendant states he was coerced into signing the guaranty. (Dkt. 40, pp. 12–14).

Both parties cite *Apfelblat v. National Bank Wyandotte–Taylor,* 158 Mich.App. 258, 404 N.W.2d 725 (1987) in support of their respective positions. The court in *Apfelblat* found that "[d]uress requires compulsion or coercion by which one is illegally forced to act by fear of serious injury to person, reputation or fortune [and][f]ear of economic ruin alone is insufficient to establish economic duress; it must be established that the person applying the coercion acted unlawfully." *Id.* The plaintiff there had threatened to enforce its contractual rights and that caused the defendant to make a claim of duress in the breach of contract action. The court found that a threat to enforce a contractual right was not an unlawful or illegal act. *Id.* Thus, a valid duress defense under Michigan law requires proof that compulsion or coercion was used in some illegal or unlawful manner to force a desired result. A party that merely fears "economic ruin" that does not result from the illegal or

---

1. In his response to plaintiff's motion, defendant did not question plaintiff's entitlement to reasonable attorney fees if plaintiff prevails on this motion but defendant did challenge the amount of attorney fees plaintiff should receive. At the hearing on the present motion, the parties stipulated that damage issues should not be addressed by the court at this time in that plaintiff intended on amending its complaint to present additional claims for damages and that damages should be reserved until a decision was made on defendant's liability for plaintiff's claims.

unlawful coercion of another does not suffer economic duress under Michigan law.[2] In the present case, defendant cannot identify any illegal or unlawful conduct employed by plaintiff to coerce defendant into signing the guaranty. Under Michigan law, the illegal, unlawful, or perhaps wrongful conduct by the other party to the contract is a necessary predicate to a duress defense and such conduct has not been alleged by defendant. The fact that defendant did not have a reasonable economic alternative to signing the guaranty in order to keep Soporex in business does not state a valid duress defense that would void the guaranty.[3]

## B. Fraudulent Inducement

■ Defendant claims that he was fraudulently induced into signing the guaranty agreement as a result of a last minute change in the bargaining position of plaintiff, which prevented Mickey Letson from also guarantying payment for medications supplied to Soporex and, as a result of "representations" made by Letson regarding the type of products that would be supplied to Soporex, if defendant signed the guaranty. (Dkt. 40, pp. 14–16). In order to state a valid defense of fraudulent inducement, defendant must show (1) that

there was a material misrepresentation by plaintiff, (2) that the representation was false, (3) that when plaintiff made the representation plaintiff knew it was false, or it was made recklessly, without knowledge of its truth and as a positive assertion, (4) that plaintiff made the representation with the intention that defendant would act on it, (5) that defendant acted in reliance on the representation and (6) that defendant suffered damage. *Belle Isle Grill v. City of Detroit*, 256 Mich.App. 463, 666 N.W.2d 271 (2003). Additionally, the misrepresentations must be made "under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Begola Services v. Wild Bros.*, 210 Mich.App. 636, 534 N.W.2d 217 (1995).

■ With respect to the "representation" by plaintiff that Mickey Letson would be a co-guarantor, defendant has not demonstrated that he acted in reliance on the representation because defendant knew that Letson would not be a co-guarantor at the time that defendant signed the guaranty. The act-in-reliance component of the fraudulent inducement test must relate to a party, believing that the representation is true, obligating himself

---

2. In *Kelsey–Hayes v. Galtaco Redlaw Castings*, 749 F.Supp. 794 (E.D.Mich.1990) a judge of this court recognized that Michigan law at that time required a showing of an unlawful or illegal act to state a valid claim of economic duress. However, the court noted that the more modern view, expressed by other courts, was that a wrongful act was sufficient and that if the Michigan Supreme Court were called upon to consider the issue they would likely find that a wrongful act was sufficient. There a threat to breach an otherwise valid contract was sufficiently "wrongful" to find that a valid claim of duress was made. Even if a "wrongful" standard, rather than illegal or unlawful, was applied to these circumstances, defendant's allegations still would fall short because defendant has not argued that plaintiff threatened to breach a valid contract

to supply the products defendant requested. Indeed, plaintiff was unwilling to continue to supply products to defendant in the face of a significant unpaid debt and such conduct could not reasonably be viewed as being wrongful.

3. The health related needs of defendant's customers are of little relevance to this analysis. It is reasonably assumed that in the American marketplace defendant's customers could have gone to any number of alternate sources for their medications. This assumption is borne out by the deposition testimony of Mickey Letson when he described his successful attempts to find other medication sources for the Soporex "patients." (Dkt. 40, Ex. T, p. 153).

or herself in reliance on the representation. Here, defendant clearly knew, albeit not for very long, that Letson would not be a co-guarantor and defendant proceeded to sign the guaranty. The causal relationship between the representation and the creation of the obligation was thus broken when defendant knew Letson would not be signing the guaranty before defendant signed it. Although defendant, after learning Letson would not be signing, may not have had long to decide whether to proceed with signing the guaranty for the increased amount, there was enough time to recognize the significance of the circumstances and consult with counsel before signing, which defendant acknowledged that he did. A person who is aware of all the facts prior to signing a contract cannot be the victim of fraud. *Cooper v. Auto Club Insurance Association,* 481 Mich. 399, 414–15, 751 N.W.2d 443 (2008). Additionally, it is not uncommon for commercial negotiations to involve changing terms until the terms are acceptable to both sides and the agreement is struck. These negotiations involved individuals, on both sides, with business experience, education and sophistication who acted on the advice of counsel.

Defendant also asserts that he was fraudulently induced into signing the guaranty by the statement of Letson, made before the guaranty was signed. The statement attributed to Letson by defendant is "when we get this deal wrapped up, you'll get everything you need [and that Harvard Drug has] everything you need." (Dkt. 40, p. 15). Defendant asserts that he "relied" on this statement but "when Harvard sent the first two shipments of medication, they did not contain the medications ordered by Soporex including the quantity of Brovana ordered or any Performist." *Id.* Defendant claims these statements by Letson were false based on the claim that what had been ordered had not been delivered in the first two ship-

ments following the signing of the purchase agreement and personal guaranty. Defendant does not claim they were never delivered but only that they were not delivered in the first two shipments sent after the purchase agreement was signed on June 6, 2008.

Plaintiff argues that this claim of fraudulent inducement fails for several reasons. The reasons include: (1) defendant has not shown that Letson made the statement with fraudulent intent, (2) defendant has not demonstrated that the statement was a material misrepresentation, (3) defendant has not established that the statement was actually false in that the amount of Brovana shipped was in excess of what was ordered during the first two weeks following the guaranty being signed, (4) no one from Soporex claimed at the time that the product supplied was less than had been required, and (5) defendant did not rely on the statement in signing the guaranty. (Dkt. 41, pp. 5–9).

With respect to the issues that defendant must establish regarding a fraud in the inducement defense, the first element that defendant would have to establish is that plaintiff made a material representation. Defendant contends that the "representation" made by plaintiff was the statement from Letson to the effect that when the deal is wrapped up defendant will have everything that is needed. It is somewhat difficult to understand exactly what was "represented" by this statement from the literal words that defendant alleges Letson used. However, it is clear from the context of these pleadings that defendant alleges that the Letson statement was a representation of what type and quantity of medications were to be delivered during the first week or two following the signing of the critical documents at issue here. Defendant obviously contends that a statement as broad as

Soporex will get "everything" it needs translates to a specific promise that a certain quantity of Brovana, and perhaps Performist, will be supplied on a certain date. Taking this allegation in the light most favorable to defendant, the undersigned cannot find that Letson's statement is a promise that a particular medication would be supplied at a particular time or otherwise relates to the actual performance of plaintiff under a contract in any specific way. The Exclusive Purchase Agreement required that Soporex provide order projections "not less than two weeks prior to placing each order." (Dkt. 41, Ex. 1). The first order, following the purchase agreement, was not placed after an order projection had been provided by Soporex so, if the order was short, it would not have been a breach of the purchase agreement. If plaintiff had failed to provide a medication, after the order projection, the remedy under the purchase agreement would have been to allow defendant to purchase the medication elsewhere, not to rescind the agreement. Letson's statement simply did not constitute a "representation" of specific conduct on the part of the plaintiff. Therefore, a failure to provide medications requested in the first two weeks, if there was a failure, could not in any reasonable fashion be viewed as breaching a promise or representation that Letson had made.

 While the failure to make a "representation" would, without more, defeat a fraud in the inducement defense, the remaining elements of such a claim will be analyzed for the sake of completeness. The second element is a requirement that the representation made be proven false. Defendant contends that the Letson statement was false because the "first two shipments of medication … did not contain the medications ordered by Soporex including the quantity of Brovana ordered or any Performist." (Dkt. 40, p. 15). Defendant's claim as to what was ordered refer-

ences an e-mail on June 6, 2008, at 1:28 p.m. from Elene McAbee. That e-mail identifies certain items that will be shipped on Friday, June 6, 2008, and other items that are to be shipped on Monday, June 9, 2008, or "when available." (Dkt. 40, Ex. L). The order was 216 cartons of Performist and 547 cartons of Brovana. For the reasons stated earlier, the Letson statement did not constitute a promise that all medications ordered would be produced on a specific date and, therefore, that statement does not become false when the first order is not filled on the date it is made. Plaintiff, in its response, demonstrates that within the first week following the execution of the purchase agreement and guaranty more Brovana was shipped than had been ordered on the first day and the order for Performist was cancelled. (Dkt. 41, pp. 6–8). Defendant has not refuted those calculations. A promise of performance on a contract could only be "false" if there was, in fact, a subsequent breach of the contract, which was not the case here. Defendant has not demonstrated, by reference to the terms of the contract or to prior course of dealing, that providing the items ordered within a week was a breach of the agreement between the parties. Merely stating that the items were not shipped the day they were ordered does not establish that a breach of the agreement took place and therefore there was no falsity in anything Letson said.

 The third element of a fraud claim is that the person making the representation knew the statement was false when it was made or the statement was made recklessly without any knowledge of its truth. Defendant does not attempt to establish that Letson made the statement knowing it was false or that he made it recklessly. Rather, defendant says, citing *Lenawee County Bd. Of Health v. Messerly,* 417 Mich. 17, 331 N.W.2d 203 (1982)

and *Shell Oil Co. v. Estate of Kert,* 161 Mich.App. 409, 411 N.W.2d 770 (1987), that it does not have to show that Letson intentionally made a false statement. The cases cited by defendant do not relieve him of the burden to demonstrate that Letson intentionally made a false statement in that those cases deal with issues of mutual mistake in a contract rather than fraud in the inducement. Defendant has, therefore, failed to demonstrate that Letson made an intentionally false statement or that he made the statement recklessly.

The fourth element of a fraud in the inducement defense is that the representation be made with the intent that it be relied on. Defendant asserts that Letson made the representation to induce defendant to execute the guaranty. (Dkt. 40, 16). Plaintiff does not dispute this assertion and it appears that, if the statement was made as claimed, it was made with the intent to encourage defendant to sign the purchase agreement and guaranty. However, that is not the same thing as making a statement with the reasonable expectation that it would be relied on with respect to some specific issue. Nothing defendant has demonstrated indicates that Letson made the statement believing that defendant would rely on it to expect that a certain quantity of Brovana and Performist would be available on June 6, 2008.

The last element of significance is that there was reliance on the false representation. Defendant asserts that the representations by Letson were important to the decision to sign the purchase agreement and guaranty. Plaintiff points to defendant's deposition in which defendant stated that if he had known that the amount of Brovana in the first order would not be shipped on the first day that "doesn't mean [he] wouldn't have signed [the purchase agreement and guaranty]." (Dkt. 41, Ex. 3, p. 68). Plaintiff contends that this testimony by defendant shows that he

did not rely on what Letson said in signing the contracts. Reliance in this context might be viewed as akin to a "but for" test. *See e.g. D E & J Limited Partnership v. Conaway,* 284 F.Supp.2d 719, 747 (E.D.Mich.2003) (" 'Transaction causation,' another way of describing reliance, is established when the misrepresentations or omissions cause the plaintiff to engage in the transaction in question. As such, transaction causation is akin to 'actual' or 'but for' causation.") (internal citations omitted). That is, but for the representation by Letson would defendant have signed the guaranty? Defendant's own deposition testimony establishes that he would not have refused to sign the contracts just because the first order of Brovana would not be shipped on the day it was ordered. If there was anything false in the Letson statement, it could only be that the Brovana was not shipped on the first day as opposed to the first week. Nothing defendant has demonstrated would suggest that such a difference would have caused him not to sign the contracts and, therefore, defendant has not demonstrated that he acted in reliance on any false statement that Letson made.

## C. *Equitable Estoppel*

Defendant also argues that plaintiff should be estopped from pursuing a claim under the terms of the guaranty for an amount exceeding one million dollars. The basis of defendant's position is the allegation that plaintiff initially indicated that it would accept a one million dollar guaranty from Letson and from defendant but later indicated that plaintiff would have to sign a two million dollar guaranty because Letson was not allowed to sign a guaranty. Defendant contends that this last minute change in position by plaintiff left him no choice but to sign the greater guaranty. (Dkt. 40, pp. 16–17). Plaintiff contends that there was no misrepresentation by

any of its agents regarding the amount of the guaranty ultimately agreed to, that defendant clearly knew what the terms of the guaranty were before he signed it and that, therefore, an equitable estoppel claim fails as a matter of law.

"Equitable estoppel may arise where (1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts." *Wojnicki v. Warren Geriatric Village*, 2009 WL 3323257 (Mich.App.2009). "Equitable estoppel is applied only when a party justifiably relies and acts on the belief that misrepresented facts are true." *Id.* Stated another way, "[e]quitable estoppel arises where one party has knowingly concealed or falsely represented a material fact, while inducing another's reasonable reliance on that misapprehension, under circumstances where the relying party would suffer prejudice if the representing or concealing party were subsequently to assume a contrary position." *Adams v. City of Detroit*, 232 Mich.App. 701, 591 N.W.2d 67 (1999).

Defendant acknowledges that he was aware, prior to signing the guaranty, that plaintiff required that the amount of the guaranty he was responsible for be increased to two million dollars.[4] He appears to contend that plaintiff knew all along that the Letson guaranty would not be allowed but that plaintiff led him to believe it would be until the last minute.[5] Defendant does not cite any authority for the proposition that equitable estoppel should apply to circumstances where he signed the obligation knowing what the true facts are even if he had been mislead at an earlier point of time, as he claims. Michigan law seems to clearly hold that there is no equitable estoppel where a persons signs a contract knowing what the true facts are, a situation that defendant does not dispute here. " 'One who is cognizant of all the material facts can claim nothing by estoppel.' " *Richards v. Lowrie & Webb Lumber*, 317 Mich. 42, 26 N.W.2d 590 (1947). Defendant's equitable estoppel claim fails as a matter of law because he was aware of all the facts prior to signing the guaranty.

D. *Amended Agreement*

Lastly, defendant argues that he should not be held responsible for the interest on plaintiff's claim because he did not agree to pay interest in the guaranty he signed. Plaintiff states that the obligation to pay

---

**4.** Plaintiff's CEO Randolph Friedman testified during a deposition that a guaranty from Letson would not be acceptable to the board and, therefore, if Soporex wanted a two million dollar line of credit, the guaranty would have to be in that amount. (Dkt. 41, Ex. 12, pp. 48–49). This suggests that defendant, after learning that the Letson guaranty was not available, elected to increase the amount of his personal guaranty in order to increase the line of credit to the higher amount.

**5.** The factual basis for defendant's argument is the claim that CEO Friedman "knew from the beginning Letson would not be allowed to execute a guaranty." (Dkt. 40, p. 17). Defendant does not cite to any portion of the record

for this assertion. Friedman's deposition testimony does not support this claim. Friedman stated he let "everyone" know the board would not accept a guaranty from Letson but only said that was before the relevant documents were signed without specifying how long before. (Dkt. 41, Ex. 12, pp. 48–49). It is not clear what defendant meant by "from the beginning" but one could reasonably assume it meant from the beginning of these negotiations which Defendant's counsel stated was around May 24, 2008. (Dkt. 40, Ex. D, ¶¶ 10–11). There is nothing in the record to support the claim that plaintiff's agents misled defendant from the outset of the negotiations regarding Letson's willingness and authorization to execute a guaranty.

interest arose from an amendment to the purchase agreement and that the terms of the guaranty that defendant signed obligates him to be bound by future amendments to the purchase agreement.

On June 6, 2008, defendant signed an Exclusive Purchase Agreement on behalf of Soporex and he also signed a Guaranty. The Exclusive Purchase Agreement related to future purchases of medications from Harvard by Soporex. The agreement did not include an obligation to pay interest on outstanding balances. The Guaranty required that defendant guaranty the payment of "sums due to HDG under the New Invoices" plus "all other charges accruing in respect of Soporex's obligations under such New Invoices and costs and expenses of collection, including a reasonable attorney's fee ..." (Dkt. 41, Ex. 7). Additionally, the Guaranty provided that defendant "hereby consents to any modifications and amendments to the New Invoices agreed to by Soporex and agrees that this Guaranty shall relate to the obligations of Soporex under such New Invoices as they may exist before and after all such modifications or amendments and hereby waives any notice of such a modifications or amendments." *Id.* On July 24, 2008, Harvard and Soporex executed a First Amendment to Exclusive Purchase Agreement Dated June 6, 2008. (Dkt. 41, Ex. 10). The amendment included, among other terms, an obligation on behalf of Soporex to pay interest on balances due for purchases made pursuant to the Exclusive Purchase Agreement. Defendant did not sign this amended agreement on behalf of Soporex due to the fact that he was hospitalized due to a tragic automobile accident that had happened a few days before the amended agreement was signed.

Michigan law generally provides that any "material alteration of a principal debt or obligation operates to completely discharge any guaranty of that debt or obli-

gation." *Wilson Leasing v. Seaway Pharmacal,* 53 Mich.App. 359, 370, 220 N.W.2d 83 (1974). An alteration of the principal debt that increases that debt is material. *Id.* An exception to this general rule is where the alteration of the principal debt is "anticipated as a possibility" by the guaranty agreement in which case the surety is not discharged by the amendment. *In re Bluestone Estate,* 121 Mich. App. 659, 667, 329 N.W.2d 446 (1982). In *Bluestone* the "fact that the guarantors expressly waived notice to future modifications demonstrates that they 'anticipated' the possibility of such modifications [and] refinancing agreements which modified [the] obligations did not operate to discharge the guarantors, even if the modifications were material." *Id.*

Similar to the agreement in *Bluestone,* the instant guaranty provided that the guarantor consented to modifications of the purchase agreement and waived notice of any modification or amendment. Applying *Bluestone* to the facts of this case directs the determination that the original purchase agreement "anticipated as a possibility" a future modification of the purchase agreement and therefore the modification here does not result in the discharge of the guaranty. The addition of the obligation to pay interest on the debt owed by Soporex modifies defendants obligation under the guaranty making defendant liable for that interest in addition to the other obligations.

## V. RECOMMENDATION

The pleadings in this case demonstrate that there are no material facts in controversy that would support the defenses raised by defendant and, therefore, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED.**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of service, as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 10 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.